# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# WACO DIVISION

| | | |
|---|---|---|
| WSOU INVESTMENTS, LLC D/B/A | § | CIVIL ACTION 6:20-cv-00455-ADA |
| BRAZOS LICENSING AND | § | CIVIL ACTION 6:20-cv-00457-ADA |
| DEVELOPMENT, | § | CIVIL ACTION 6:20-cv-00459-ADA |
| *Plaintiff*, | § | CIVIL ACTION 6:20-cv-00463-ADA |
| | § | |
| v. | § | |
| | § | |
| MICROSOFT CORPORATION, | § | |
| *Defendant.* | § | |

**PLAINTIFF'S REPLY CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

Table of Contents .................................................................................................................. ii

Table of Authorities ............................................................................................................. iii

Abbreviations ....................................................................................................................... iv

Exhibits ................................................................................................................................. v

I.     U.S. PATENT NO. 7,750,286 (Case No. WA:20-cv-00459-ADA) ................................ 1

    A.     "polarization beam splitter (PBS)" (Claim 15) ....................................................... 1

    B.     "quarter-wave plate" (Claim 15) .............................................................................. 3

    C.     "spatial light modulator (SLM)" (Claim 15) ............................................................ 4

II.     U.S. PATENT NO. 8,226,241 (Case No. WA:20-cv-00463-ADA) ................................ 6

    A.     "spatial light modulator" (Claim 15) ....................................................................... 6

III.     U.S. PATENT NO. 8,965,978 (Case No. WA:20-cv-00457-ADA) ................................ 7

    A.     "third-party lobby" (Claims 1 and 12) ..................................................................... 7

    B.     "lobby" (Claim 12) .................................................................................................. 8

IV.     U.S. PATENT NO. 9,814,988 (Case No. WA:20-cv-00455-ADA) ................................ 9

    A.     "adaptor unit" (Claim 20) ........................................................................................ 9

## TABLE OF AUTHORITIES

**Cases**

*Callaway Golf Co. v. Acushnet Co.*,
   576 F.3d 1331 (Fed. Cir. 2009) ...................................................................................... 7

*GREE, Inc. v. Supercell Oy*,
   219CV00071JRGRSP, 2020 WL 3893697 (E.D. Tex. July 9, 2020) ...................................... 2

*Liebe-Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004) ........................................................................................ 3

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
   378 F.3d 1396 (Fed. Cir. 2004) ..................................................................................... 10

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
   574 U.S. 318 (2015) ........................................................................................................ 2

*Thorner v. Sony Computer Entm't Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012) ....................................................................................... 1

## ABBREVIATIONS

| Abbreviation | Description |
|:---:|---|
| Br. | WSOU's Opening Claim Construction Brief |
| Resp. | Defendant's Responsive Claim Construction Brief |

**EXHIBITS**

| Exhibit | Description |
|---|---|
| A | Appl. Ser. No. 11/765,155, Not. Of Allow. of 02/23/10. |
| B | MPEP §§606, 606.01 (8th ed. Rev. 7 July 2008). |
| C | M. Shokooh-Saremi et al., Design of Multilayer Polarizing Beam Splitters Using Genetic Algorithm, 233 *Optics Communications* 57 (2004) at 57. |
| D | David W. Ball, *Field Guide to Spectroscopy* (2004) at 28. |
| E | Eugene Hecht, *Optics* (3rd ed. 1998), at 349 (Microsot_HoloLens_WSOU000003941) ("*Hecht*"). |
| F | Cardinal Warde et al., Charge-Transfer-Plate Spatial Light Modulators, 31 *Applied Optics* 20, at 3971 (Jul. 10, 1992) ("Warde Article". |
| G | Spatial Light Modulator, Wikipedia, (archived Sept. 13, 2006) https://web.archive.org/web/20060913000000/https:/en.wikipedia.org/wiki/Spatial_light_modulator ("Wikipedia Article"). |
| H | Appl. Ser. No. 11/393,900, Response of 07/10/09. |
| I | Appl. Ser. No. 11/393,900, Amendment of 01/11/10. |
| J | Appl. Ser. No. 11/393,900, Not. of Allow. of 10/07/14. |
| K | *Hecht* at 324 (Microsot_HoloLens_WSOU000003916). |

**EXHIBITS**

| Exhibit | Description |
|---|---|
| A | Appl. Ser. No. 11/765,155, Not. Of Allow. of 02/23/10. |
| B | MPEP §§606, 606.01 (8th ed. Rev. 7 July 2008). |
| C | M. Shokooh-Saremi et al., Design of Multilayer Polarizing Beam Splitters Using Genetic Algorithm, 233 *Optics Communications* 57 (2004) at 57. |
| D | David W. Ball, *Field Guide to Spectroscopy* (2004) at 28. |
| E | Eugene Hecht, *Optics* (3rd ed. 1998), at 349 (Microsot_HoloLens_WSOU000003941) ("*Hecht*"). |
| F | Cardinal Warde et al., Charge-Transfer-Plate Spatial Light Modulators, 31 *Applied Optics* 20, at 3971 (Jul. 10, 1992) ("Warde Article". |
| G | Spatial Light Modulator, Wikipedia, (archived Sept. 13, 2006) https://web.archive.org/web/20060913000000/https:/en.wikipedia.org/wiki/Spatial_light_modulator ("Wikipedia Article"). |
| H | Appl. Ser. No. 11/393,900, Response of 07/10/09. |
| I | Appl. Ser. No. 11/393,900, Amendment of 01/11/10. |
| J | Appl. Ser. No. 11/393,900, Not. of Allow. of 10/07/14. |
| K | *Hecht* at 324 (Microsot_HoloLens_WSOU000003916). |

For the below-listed terms, an overarching and consistent flaw in Microsoft's approach is its objection to application of the plain and ordinary meaning while at the same time failing to assert either of the recognized "two exceptions to [the] general rule"—lexicography or disavowal. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Accordingly, the plain and ordinary meaning should stand, and no construction is required. WSOU addresses additional specific flaws in Microsoft's approach in ordinally-numbered paragraphs in the respective sections for each term below.

I.  **U.S. PATENT NO. 7,750,286 (CASE NO. WA:20-CV-00459-ADA)**

   A.  **"polarization beam splitter (PBS)" (Claim 15)**

*First*, Microsoft does not dispute that a POSITA would have understood the term to have a plain and ordinary meaning as WSOU explained by noting, *inter alia*, the Examiner's understanding of the term during prosecution. Br. at 3. Indeed, Microsoft mischaracterizes WSOU's position by stating that the "***only dispute*** is whether the polarization beam splitter is limited to a cube, or can be a plate." Resp. at 3.[1] This is incorrect. While WSOU pointed out multiple flaws in Microsoft's construction (Br. at 2-5), the ***primary dispute*** is whether ***any*** construction is required when the intrinsic evidence establishes that a POSITA would have understood the term and neither *Thorner* exception applies. *See* 669 F.3d at 1365.

*Second*, by arguing that the term should be artificially limited to a cubic form disclosed in certain embodiments (Resp. at 4-6), Microsoft commits the "cardinal sin" of importing limitations from the specification. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1319-20 (Fed. Cir. 2005) (en banc). Microsoft suggests its position is somehow justified in violating the prohibition because the specification "consistently describes the PBS as a cube." Resp. at 4. But the *Phillips* opinion itself "***expressly rejected*** the contention that if a patent describes ***only a single embodiment***, the claims of the patent must be construed as being limited to that embodiment." 415 F.3d at 1323 (noting that "persons of ordinary skill in the art rarely would confine their definitions of terms to the exact

---

[1] Emphasis is added unless otherwise noted.

1

representations depicted in the embodiments.").

**Third**, Microsoft falsely states that a PBS is "consistently describe[d]" as a cube. *See id.* The specification includes multiple descriptions of a "PBS" or "polarization beam splitter" without reference to "cube" or "cubic." '286 patent at 1:41-2:3 (listing "PBS" 17 times); 3:6-30. It is only in describing the specific details of a preferred embodiment that the cubic form is first discussed, and only with an introductory phrase "[m]ore specifically." *Id.* at 3:56. The reference to "[m]ore specifically" is telling because it is indicative that the patentee signaling the existence of both the broad PBS concept and the "[m]ore specific[]" cubic form.

**Fourth**, Microsoft errs by arguing that the "jury needs a construction to understand this term and to avoid allowing the parties' experts to argue claim construction to the jury." Resp. Br. at 4. But the test for plain and ordinary meaning is not what a ***jury*** would understand, but instead the "meaning that the term would have to a ***[POSITA]*** at the time of the invention." *Phillips*, 415 F.3d at 1313. Accordingly, for terms "given their plain and ordinary meaning, the jury is free to apply an expert's description of the claims if it is consistent with the jury's understanding." *GREE, Inc. v. Supercell Oy*, 219CV00071JRGRSP, 2020 WL 3893697, at *1 (E.D. Tex. July 9, 2020) (internal citations omitted). For instance, a POSITA that provides an opinion that an accused product does not meet a claim limitation "constitutes a non-infringement opinion, does not amount to claim construction, and is properly presentable to the jury." *Id.* Even if jury understandable was the litmus test for claim construction, Microsoft's construction is more dense and less understandable to a lay juror. Terms like "conjoined prisms" and "orthogonal" will be ***less*** understandable to the jury than the term itself. Jurors would understand the concept of polarization through everyday objects like polarized sunglasses, and a jury would readily understand the concept of splitting a light beam.

**Fifth**, Microsoft's attack on WSOU's proper use of extrinsic evidence is unfounded. *See* Resp. at 5. In *Phillips*, the Federal Circuit noted that for "terms that have a particular meaning in the field of art," courts should look to both the intrinsic evidence and "extrinsic evidence concerning relevant scientific principles, the meaning of technical terms." 415 F.3d at 1314; *see also Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 326 (2015) ("extrinsic evidence may help to

'establish a usage of trade or locality'"). Thus, WSOU's reliance on extrinsic evidence is warranted. Tellingly, Microsoft fails to rely on extrinsic evidence for this term despite its seeming concession that PBS is a term of art.

**Sixth**, Microsoft fails to rebut the presumption of claim differentiation. Microsoft states that the "specification only discloses the PBS as a cube." Resp. at 6. But Microsoft's argument is based on the false premise that a PBS is "only" referenced to "cube" or "cubic" throughout the specification. As noted above, this is false, and a POSITA would have understood the generic references to PBS in the specification to include, at a minimum, both its cube and plate forms.

**Seventh**, Microsoft errs by arguing that "WSOU has not shown" how the claims would satisfy the enablement or written description requirements. *See* Resp. at 5. As an initial matter, it is Microsoft's (not WSOU's) burden to prove invalidity by clear and convincing evidence. The Federal Circuit has "admonished against judicial writing of claims to preserve validity. *Liebe-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 911 (Fed. Cir. 2004). "[T]he cannon that claims should be construed to preserve their validity, if possible, applies only if the scope of the claims is ambiguous." *Id.* Since Microsoft does not explain either §112 theory, it would be inappropriate for the Court to address any validity issues at this stage.

### B.   "quarter-wave plate" (Claim 15)

***First***, with respect to whether the quarter wave plate "shift a polarized light beam," the issue is not whether, ***in theory***, the light beam acted on is natural or polarized light. As the extrinsic textbook that both parties rely on makes clear, ***in real applications***, light is generally neither completely polarized nor completely natural:

> Whether natural in origin or artificial, ***light is generally neither completely polarized nor completely unpolarized: both cases are extremes***. More often, the electric-field vector varies in a way that is neither totally regular nor totally irregular, and such an optical disturbance is ***partially polarized***. *One* useful way of describing this behavior is to envision it as the result of the superposition of specific amounts of natural and polarized light.

(**Ex. K**). Accordingly, a POSITA would thus have understood that a "quarter wave plate" in real-world applications would act on light with any component of polarized light, including partially

3

polarized light. This comports with the specification's description of a "[q]uarter-wave plate 154" with "two orthogonal linear polarization components of an *optical* beam … passing therethrough" (as opposed to a "*polarized* beam" as Microsoft proposes). Microsoft's inclusion of "*polarized* light beam" seems to be based on a desire that would exclude not only the accused devices but almost any real-world device.

*Second*, Microsoft also errs by alleging that WSOU is asserting lexicography by arguing that "quarter wave plates" should be construed to include those plates that shift "about" one quarter wave as the specification acknowledges. Resp. at 8. The patentee recognized that while quarter wave plates in theory shift by one quarter wavelength, that in real world applications, the shift is not always exactly one quarter wave and qualified the description with the word "about." '286 patent at 3:16. Microsoft wrongly claims that the patentee should have defined a "specific range." Resp. at 8. Ultimately, however, Microsoft's point only proves the folly in deviating from the plain and ordinary meaning. A POSITA would have understood the meaning of "quarter wave plate" within the context of real-world tolerances. Microsoft also fails to offer any response to WSOU noting that Microsoft's construction would exclude a preferred embodiment. *Compare* Br. at 5-6 *with* Resp. at 8.

*Third*, Microsoft ignores one of the flaws that WSOU identified in Microsoft's construction—that the light beams "pass *therethrough*." Br. at 5. As noted, the very same textbook that Microsoft relies on describes a quarter-wave plate merely as an "optical element that introduces a relative phase shift of $\Delta \varphi = \pi/2$ between the constituent orthogonal o- and e-components of a wave." *Hecht* at 349 (**Ex. E**). There is no requirement that the light beams "pass therethrough." For instance, if a quarter-wave plate is reflective, the beam would not necessarily "pass therethrough" but still shift the components by the requisite amount.

C. **"spatial light modulator (SLM)" (Claim 15)**

*First*, Microsoft mischaracterizes the intrinsic evidence as being tied to a two-dimensional pixel structure. Asserted claim 15 merely references "spatial light modulator (SLM) optically coupled to the PBS." '286 patent at 9:22. Nothing in Claim 15 or any of its dependent claims require

4

that an SLM should be limited those "*with a 2-dimensional arrangement of pixels that displays an image*." Microsoft focuses solely on one embodiment of the SLM described in the specification, a liquid-crystal-on-silicon (LCOS). *Id.* at 3:6-7. But Microsoft ignores the broader description that "[t]he SLM is **adapted to spatially modulate the beam received** from the PBS." *Id.* at 1:49-52. The specification states that "[a] representative embodiment of the invention provides a compact image projector having a light source coupled to a spatial light modulator (SLM)." *Id.* at 1:26-28. And while the light source is described as having a "substantially planar structure," the same section does not limit the SLM; the specification only acknowledges that the "SLM is dominated by its length and/or width." *Id.* at 29-30. Any SLMs (including those that are not two-dimensional) have a length and width. The specification then goes onto describe two particular embodiments that include an SLM. *Id.* at 1:41-2:3. But neither of these descriptions mention "*a 2-dimensional arrangement of pixels that displays an image*" that Microsoft now attempts to impose. *Id.*

**Second,** Microsoft once again commits the "cardinal sin" of importing limitations from the specification. *Phillips*, 415 F.3d at 1319-20. Even if the '286 patent disclosed just the LCOS embodiment (which WSOU does not concede), it would be improper to "confine [the] definitions of terms to the exact representations depicted in the embodiments." *Phillips*, 415 F.3d at 1323.

**Third**, Microsoft is also wrong to assert that the extrinsic evidence WSOU cites is "consistent with Microsoft's construction." While Microsoft notes that the Warde Article starts with "[t]wo-dimensional spatial light modulators (SLM's)," Microsoft draws the wrong conclusion. The qualifier "two-dimensional" before "spatial light modulator" clearly demonstrates that a POSITA would understand that not all SLMs are two-dimensional. That is why in the next sentence the Warde Article provides the broader definition of SLMs: "SLM's modify the amplitude, phase, polarization, or intensity of a readout light beam in response to either the intensity of a second write-light beam or to a two-dimensional electrical voltage or current pattern." Warde Article at 3971. The fact that the Warde Article then goes onto discuss one particular type of SLMs that is two-dimensional does not undercut the broader definition. The Wikipedia Article also refutes Microsoft's construction as it describes an SLM as "an object that *imposes some form of spatially-*

5

*varying Modulation on a beam of light."* Wikipedia Article at 1.[2] While Microsoft attempts to align its construction to a discussion of an "overhead projector transparency" in the Wikipedia article (Resp. at 11), the Wikipedia Article describes that merely as a "simple example" of an SLM, and does not use that "simple example" to define the full scope of SLMs.

II.     U.S. PATENT NO. 8,226,241 (CASE NO. WA:20-CV-00463-ADA)

    A.     "spatial light modulator" (Claim 15)

***First***, WSOU objects to Microsoft not separately treating the construction of the term "spatial light modulator" in the '241 patent and "spatial light modulator (SLM)" in the '286 patent. WSOU's treatment of both terms together is logically consistent as WSOU is taking the position that both terms should be accorded their plain and ordinary meaning. But Microsoft's arguments, particularly those that cite to intrinsic evidence of the respective patents, are improper. As WSOU noted, the '241 patent and '286 patent did not issue from related applications. Nor do they share a common specification or prosecution history. And neither patent incorporates by reference the other respective patent. Microsoft's blended analysis of the two unrelated patents is improper.

***Second***, Microsoft mischaracterizes the specification of the '241 patent as only being related to a "two-dimensional array of pixels." Resp. at 10. Microsoft ignores the specification describing the broader disclosure of an SLM: "The SLM is adapted to modulate received illuminating light using a spatial pattern generated by a plurality of pixels to form the image." '241 patent at 1:53-56; *accord* 2:11-13. Even the portions of the '241 patent cited by Microsoft make it clear that the alleged rectangular embodiment is only "typical[]" and "generally" but not mandatory. *Id.* at 4:57-60 ("SLM 156 ***typically*** has a ***generally*** rectangular active area …").

***Third***, Microsoft once again commits the "cardinal sin" of importing limitations from the specification. *Phillips*, 415 F.3d at 1319-20. Even if the '286 patent disclosed just the LCOS embodiment (which WSOU does not concede), it would be improper to "confine [the] definitions

---

[2]     Microsoft attempts to discredit the Wikipedia Article. Resp. at 11 ("to the extent it has any evidentiary value"). Tellingly, Microsoft does not contest that the Wikipedia Article reflects the knowledge of a POSITA.

of terms to the exact representations depicted in the embodiments." *Phillips*, 415 F.3d at 1323.

***Fourth***, Microsoft errs by relying on the '638 patent. While the application that issued as the '638 patent was incorporated by reference in the '241 patent, the incorporation was only for "[d]escriptions of several additional image projectors, in which various embodiments of the invention can also be practice." '241 patent at 3:5-10. For incorporation by reference, "the host document must identify with detailed particularity ***what specific material it incorporates*** and clearly indicate where that material is found in the various documents." *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1346 (Fed. Cir. 2009) (citations omitted). Here, "detailed particularity of … specific material" is merely the general descriptions of additional image processors. There is no indication in the incorporation by reference statement that the patentees of the '241 patent intended to broadly import statements in the '638 patent regarding the meaning of SLMs.

### III.   U.S. PATENT NO. 8,965,978 (CASE NO. WA:20-CV-00457-ADA)

#### A.   "third-party lobby" (Claims 1 and 12)

***First***, Microsoft distorts the claim language by importing words that do not exist in the claim and blurring the distinction between claims 1 and 12. With respect to claim 1, the only reference to "lobby" is a "third party lobby."  There is no recitation of a "local lobby" (as in Microsoft's construction) or a standalone reference to "lobby."  To then introduce the concept of a "local lobby" or standalone "lobby" when neither term is recited in the claims runs afoul with the scrivener's intent. Microsoft attempts to interject the notion of standalone "lobby" into claim 1 by claiming that the "***lobby*** forwards the request to the third party lobby." Resp. at 15. But the claim language of claim 1, a method claim, does not specify that the "forwarding" step originate from the non-existent "lobby" that Microsoft attempts to impose on claim 1. Claim 1 recites the step of "comparing profiles of the identified and available *third party users*, with attributes of *a request* to initiate an online gaming session of a game by a user…" '978 patent at 10:11-13. The "request" is then referenced in claim 1 in the step for "forwarding requirements of the request on to *a third party lobby to identify the third party users that satisfy the request*." *Id.* at 10:24-26. Thus, the claim language—and in particular the relationship between the "request" and "third party lobby"—is

sufficiently bounded.

With respect to claim 12, a similar result but non-identical analysis applies. Unlike claim 1, claim 12 expressly recites a standalone "lobby" that is "operable to receive one or more identifies of one or more third party users." The standalone term "lobby" is not subsequently recited in claim 12. Thus, contrary to Microsoft's contention, there is no requirement in claim 12 that the recitation of "a memory storing instructions to …. forward requirements of the request on to a third party lobby …" originate from the previously-recited standalone "lobby." Claim 12 only requires that the requirements of the request be "forward[ed]."

***Second,*** because standalone "lobby" is not recited in claim 1 and "lobby" is recited in claim 12 but not linked in the claim language to "third party lobby" as noted above, there is no reason to define a "third party lobby" as "separate from the local lobby." Indeed, the word "separate" is used in the specification to describe that different components can be stored either on the same medium or "separate mediums." For instance, in discussing the specification describes "agent 3 and lobby 4" may be either (i) stored on computer readable medium "that are also part of one or more larger devices" or (ii) "separate components/applications and need not be co-located." *Id.* at 2:40-47. While this discussion does not directly address any purported distinction between "lobby" and "third party lobby," if anything, this portion specification teaches that the components of the invention are agnostic to "separate[ness]" and/or co-location. Finally, this portion of the specification also highlights a flaw in Microsoft's construction—it is unclear what Microsoft intends by meant by "separate." Does Microsoft intend its requirement of "separateness" to apply to location storage or something else?  This arbitrary restriction appears to be driven by Microsoft's desire to create an artificial distinction that it will use as a non-infringement basis in the future.

B.     **"lobby" (Claim 12)**

***First***, Microsoft provides no basis or evidence for its bald assertion that "the term 'lobby' has no single, common, or accepted meaning in the realm of online gaming or in the software context more generally." Resp. at 13. Nor does Microsoft provide any evidentiary basis for what it describes as the meaning of "lobby" in the "common parlence … makes no sense in this context."

*Id.* A POSITA would have experienced that many terms originating in the physical world—e.g, chat room or bulletin board—have their digital equivalent in the virtual world. Moreover, the surrounding provides context to a POSITA.

**Second,** Microsoft errs by arguing that a single recitation to "the present invention" limits the scope of "lobby." The Federal Circuit has held that "use of the phrase 'present invention' or 'this invention' is not always so limiting, such as where the references . . . are not uniform, or where other portions of the intrinsic evidence do not support applying the limitation to the entire patent." *Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 798 (Fed. Cir. 2019). Here, use of the "the present invention" in the specification does not uniformly require the use two "inter-related functions of matching users and forming groups" that Microsoft proposes. Nor does the "present invention" reference upon which Microsoft relies characterize the invention "as a whole." Under these circumstances, the claims are not limited by any descriptions in the specification relating to "present invention." *See id.*

**Third**, apart from its baseless "present invention" argument, the remainder of Microsoft's recitations to the specification are nothing more than a thinly-veiled attempt to import limitations from the specifications into the claims (i.e., by seeking to redraft the term "lobby" as "software and/or hardware that matches users to form groups"). The claim language, however, does not reference "software," "hardware," or "matches." The entirety of Microsoft's proposed construction impermissibly seeks to add these limitations neither required by claim term "lobby" nor unambiguously required by either the specification or the prosecution history. *See*, *e.g.*, *Cont'l Circuits*, 915 F.3d 788 at 796–97.

### IV.  U.S. PATENT NO. 9,814,988 (CASE NO. WA:20-CV-00455-ADA)

#### A.  "adaptor unit" (Claim 20)

**First,** Microsoft ignores the broad description of this term expressly provided in the specification: "The invention has particular … relevance to ***an adaptor unit which connects to the games console and which increases the functionality of the games console***." '988 patent at 1:7-8. While WSOU maintains that the plain and ordinary meaning should apply, in the event the Court

deems construction necessary, an "adaptor unit" should be construed as a unit that "connects to the games console and which increases the functionality of the games console." Given this broad and express description of "adaptor unit," one can readily see how most, if not all, of Microsoft's characterizations of the specification are inaccurate. For instance, Microsoft states that the "specification *consistently describes* the adaptor unit as having a video receiver." Resp. at 19. But the broader description of "adaptor unit" above makes no mention of a video receiver, just a broad reference to "increase[ed] functionality." Equally lacking in the broader description is any reference to the whole host of limitations that Microsoft contends are required to be part of an adaptor unit, including a CPU for decryption / encryption, hard disk for storing video and game history data. *Id.* at 19.

**Second,** Microsoft again commits the "cardinal sin" of importing limitations from the specification into the claims. See Resp. at 18-20. As WSOU noted, the specification describes "an exemplary embodiment" having the components in Microsoft's construction; it is not unambiguously offered as explicit lexicography that necessarily pertains universally to *all* adaptor units in *all* disclosed embodiments. Br. at 13-15 (citing '988 patent at 2:8-41). Nothing in this portion of the specification or elsewhere indicates any disavowal of the broader meaning.

**Third**, Microsoft miscasts WSOU's arguments regarding claims 1 and 20 as claim differentiation. WSOU did not invoke claim differentiation. Rather, as WSOU explained, unasserted claim 1 expressly recites an "adaptor unit" with a "video data receiver" and "large capacity storage device." Applying Microsoft's construction to claim 1, would render the "video data receiver" and "large capacity storage device" claim language superfluous. *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004) ("interpretations that render some portion of the claim language superfluous are disfavored."). In other words, if as Microsoft contends, an "adaptor unit" always requires a "video receiver" and a "hard disk," there would have be no need for the patentee to expressly limit "adaptor unit" in claim 1 to include those components.

Dated: February 11, 2021 Respectfully submitted,

By: */s/ Ryan Loveless*
James L. Etheridge
Texas Bar No. 24059147
Ryan S. Loveless
Texas Bar No. 24036997
Brett A. Mangrum
Texas Bar No. 24065671
Travis L. Richins
Texas Bar No. 24061296
Jeffrey Huang
Brian M. Koide
Etheridge Law Group, PLLC
2600 E. Southlake Blvd., Suite 120 / 324
Southlake, TX 76092
Tel.: (817) 470-7249
Fax: (817) 887-5950
Jim@EtheridgeLaw.com
Ryan@EtheridgeLaw.com
Brett@EtheridgeLaw.com
Travis@EtheridgeLaw.com
Jhuang@EtheridgeLaw.com
Brian@EtheridgeLaw.com

Mark D. Siegmund
State Bar No. 24117055
mark@waltfairpllc.com
Law Firm of Walt, Fair PLLC.
1508 North Valley Mills Drive
Waco, Texas 76710
Telephone: (254) 772-6400
Facsimile: (254) 772-6432

*Counsel for Plaintiff WSOU Investments, LLC*

11

## **CERTIFICATE OF SERVICE**

A true and correct copy of the foregoing instrument was served or delivered electronically via U.S. District Court [LIVE]- Document Filing System, to all counsel of record, on this the 11th day of February 2021.

*/s/ James L. Etheridge*
James L. Etheridge